ANDERSON *v.* CRESWELL-KEITH, INC.

5-2049                                                332 S. W. 2d 610

Opinion delivered March 7, 1960.

*Shackleford* and *Shackleford,* for appellant.

*Spencer & Spencer,* for appellee.

JIM JOHNSON, Associate Justice. This case involves an oil property transaction. It is primarily a suit in equity to recover $4,000 under the terms of a written instrument.

On November 27, 1956, appellant, W. S. Anderson, and appellee, Creswell-Keith, Inc., entered into the following agreement:

"AGREEMENT BETWEEN CRESWELL-KEITH MINING TRUST and Mr. W. S. Anderson on his purchase of an undivided one-eighth (1/8) interest in the Moody Estate No. 1, we will hold his check in the amount of $4,000.00 in Creswell-Keith, Inc., office until Moody No. 1 is fractured and producing oil into tank, at such time Mr. Anderson will say if he wants to keep his interest or sign back to Creswell-Keith.

"Mr. Anderson will also have option to participate, at same price, at any time we decide to drill Moody Estate No. 2.

"Witness our hands this November 27, 1956."

On the same date the assignment of an undivided one-eighth interest in the Moody No. 1 well and the lease on which it was located was executed, acknowledged and delivered to W. S. Anderson.

On December 3, 1956, the $4,000 check was cleared through the Commercial National Bank of Little Rock. The Moody No. 1 well, according to the undisputed evidence, was fractured and producing oil into the tanks on December 10, 1956.

On December 19, 1956, nine days after the well was fractured and producing into the tanks, the assignment which had been delivered to the appellant, W. S. Anderson, on the 27th day of November was filed for record in the office of the recorder for Union County, Arkansas.

On January 15, 1957, the appellant, W. S. Anderson, exercised his option to participate in the Moody No. 2 well to be drilled on the same lease, purchased a one-half interest and paid to Creswell-Keith, Inc., the sum of $18,000, which consisted of a check for $6,000; a promissory note from appellant to Creswell-Keith, Inc., for $2,000; and the assignment of a note of $10,000 held by the appellant.

The record reflects that appellant, W. S. Anderson, has never assigned back to Creswell-Keith, Inc., the one-eighth interest in the Moody No. 1 well, has never tendered such an assignment and did not offer to assign this interest back in his intervention filed to recover the money paid for this interest.

Based on the agreement set forth above, the appellant, W. S. Anderson, filed his intervention in which he alleged that the Moody No. 1 well had never been fractured and produced oil into the tanks, and that he had demanded his money back.

His testimony at the trial was to the effect that on January 15, 1957, 26 days after the time when he had the option to assign back his interest, and 17 days after his assignment had been recorded, he demanded his money back.

On January 18, 1958, appellant filed his intervention for the $4,000 in other litigation not pertinent to the issues herein. A general denial was filed by appellee. Meanwhile, appellee filed a separate proceeding to recover for operating expenses on the Moody No. 1 and other wells not involved herein. These causes were consolidated for trial on November 7, 1958. The court took the matter under advisement and on March 19, 1959, entered its order and finding that appellant was the owner of a 1/8 interest in the Moody No. 1, that he was liable for operating expenses thereon to appellee, and dismissed appellant's intervention for want of equity. From that decree comes this appeal.

For reversal appellant relies on the following points:

1. Findings of Chancellor that appellant is owner of undivided 1/8 interest in Moody No. 1 is against preponderance of the evidence.

A. Undisputed evidence reflects appellee breached agreement when check was deposited.

B. Preponderance of evidence reflects appellant exercised option.

2. In the alternative, appellee did not prove certain items charged to be operating expenses and judgment of $400.69 is error.

In considering the first point urged for reversal we must agree with appellant that the cashing of the $4,000 check by appellee prior to the time the Moody No. 1 oil well was 'fractured and producing oil into tank' was a variance from the written agreement entered into by the parties on November 27, 1956. There can be no doubt but that if appellant had exercised his option to reassign the lease to appellee at the proper

time, he would be entitled to have the check returned, or a refund of the money since the check had been cashed. Looking at this instrument in its entirety and viewing the record for testimony relative to the intention of the parties, we find the following testimony of Mr. Neville Keith concerning the January 15, 1957, meeting:

"Q.  At that time did he make any demand for return of his money from Moody No. 1?

"A.  No, sir, he sure didn't.

"Q.  What did he do at that time?

"A.  He wanted to participate with us in the drilling of the Moody No. 2 which we were preparing to drill.  He stated he wanted a bigger interest because he thought it should be a bigger well than Moody No. 1.

"Q.  How much interest did he have in the No. 1?

"A.  An eighth.

"Q.  How much did he want in Moody No. 2?

"A.  He wanted a half interest."

This testimony of Neville Keith is completely consistent with the deal that was made on the 15th of January 1957.

At that time the appellant admits he purchased a one-half interest in the Moody No. 2 well, which was to be drilled on the same lease by the same operator, Creswell-Keith, for the sum of $18,000.

To pay this $18,000 he gave his personal check for $6,000; his personal promissory note for $2,000; and assigned to Creswell-Keith another note for $10,-000.  From this series of events we cannot escape the conclusion that appellant would not have done this had he been there demanding the return of his $4,000.  At the very least he would have deducted the $4,000 from the cost of the new venture.

Appellant testified under examination by his own attorney:

"Q. Mr. Anderson, are you the owner of a 1/8 interest in Moody No. 1?

"A. I am."

From what we have said above and other matters contained in the record we cannot say that the decree of the Chancellor on the first point urged by appellant was against the weight of the evidence. See: *Zachery* v. *Warmack,* 213 Ark. 808, 212 S. W. 2d 706; and *High* v. *Bailey,* 203 Ark. 461, 157 S. W. 2d 203.

The second point urged for reversal presents an entirely different question. Since it is established that appellant is the owner of a 1/8 interest in Moody No. 1 well it must follow that the terms of the assignment instrument by which title to this interest was obtained controls.

The assignment contained the following clause:

"That if the said well proves to be a producer of oil or gas, same shall be operated by assignors for the benefit of themselves and assignees, and in such event, assignee agrees after completion and equipping by assignors as hereinabove stated, that he will reimburse assignee for the 1/8 interest . . ."

Following the clear terms of this assignment on trial *de novo,* without setting out in detail the testimony relative to all the expenses incurred in the operation of the well, we conclude that the judgment of the trial court for operating expenses in the amount of $400.69 should be reduced to the extent hereinafter indicated:

## SWITCHER SERVICE

Testimony on July 15, 1959, taken by agreement of the parties, reflects that switcher service for the Moody No. 1 was charged at the rate of $75 per month between January 1957, and September 1957. Yet, thereafter, only $50 per month was charged. The testimony revealed that $50 was the standard price for switcher service. However, appellee attempted to reconcile this difference on the basis that the $75 per month included

and was to cover administrative costs. We noted that on the statement of the period January 1957, to September 1957, the line following "Switcher Service" is "Administrative costs" at $15 per month. We find that the switcher service costs is excessive for this period and the item of Switcher Service should be reduced from $525 to $350, making total due on this statement of $163.32.

## ELECTRICAL MOTOR

The testimony of July 15, 1959, reflects that the appellee changed from a gas-driven motor to an electrical motor. It did so without consulting any of the interested parties, and particularly without mentioning this to appellant. Further, it was shown by the testimony that this was an extravagant effort on the part of appellee, wholly without economic outlook, particularly when it was known the well would not produce. Figuring the costs of setting up the electric motor as reflected on Plaintiff's Exhibit D, there was a charge of $472.35, composed of the following: Industrial Elec. Co., $343.71 and $90; Williamson Tool & Die Co., $29.06; and Arkansas Power & Light Company, $9.58. This statement should be reduced by $59.04, or a charge of $43.06.

## COSTS OF LITIGATION IN HARRIS MATTER

This litigation involved an expense of $800 and was charged as an operating expense of the Moody No. 1. Even the appellee admits that this is not an operating expense of the well.

"Q. Is that an expense for operating the well itself?

"A. No, I wouldn't think so."

Further testimony was to the effect that the damage done, if any, to the Harris property was even before the well was drilled and while moving the rig in. We find that the statement with these charges is excessive by $100 and that expense should be eliminated.

As a result of the excessive charges hereinabove set out, the judgment for operating costs is reduced to $219.77.

From what we have said above, the decree of the Chancellor is modified only to the extent indicated and affirmed, and the cause is remanded with directions to enter an order consistent with this opinion.

Modified and affirmed.